**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

United States of America,                                    Case No. 24-cr-124 (ADM/DJF)

                   Plaintiff,

                                                            **ORDER AND**
v.                                              **REPORT AND RECOMMENDATION**

Jeremiah Thelmon-Isaiah Hand,

                   Defendant.

**INTRODUCTION**

On May 7, 2024, the government charged Defendant Jeremiah Thelmon-Isaiah Hand with Possession with Intent to Distribute Fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); Possession of a Firearm as a Felon in violation of 18 U.S.C. §§ 922 (g)(1) and 924(a)(8); and Carrying a Firearm During and in Relation to a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c)(1)(A)(i) (ECF No. 1). This matter is before the Court on Mr. Hand's Pretrial Motion to Disclose and Make Informant Available for Interview (ECF No. 26), Pretrial Motion to Suppress Statements (ECF No. 37), Pretrial Motion to Suppress Fruits of Unlawful Arrest and Search and Seizure (ECF No. 38), and Motion for a Hearing Pursuant to *Franks v. Delaware* (ECF No. 39).

The Court held a hearing on Mr. Hand's motions on October 25, 2024. (ECF No. 44.) During the hearing, the Court admitted into evidence Government Exhibits 1-7 and Defense Exhibit 5. (*Id*.) The Court also received testimony from three government witnesses: Minneapolis-St. Paul International Airport Police Sergeant Jeffrey Trevino, Roseville Police Officer Dennis Cook, and St. Paul Police Officer Shawn Longen. (ECF No. 48.) For the reasons

given below, the Court denies Mr. Hand's request for a *Franks* hearing and recommends that his motions to disclose the informant and suppress the fruits of the search and seizure be denied. The Court recommends denying Mr. Hand's motion to suppress statements with prejudice in part and without prejudice in part.

**BACKGROUND**

### I.       The Confidential Source

On the morning of August 4, 2024, Officer Longen received a phone call from a sergeant with the St. Paul Police Department notifying Officer Longen that an informant had told him an individual identified as Mr. Hand would be at the St. Paul Union Depot bus terminal that afternoon traveling from St. Paul to Chicago, possibly with a gun and narcotics.  (*Id.* at 130, 136.)  Officer Longen testified that the sergeant did not provide the source's identity and only informed Officer Longen that "he had a person who provided that information to him."  (*Id.* at 131.)  There is no other information in the record about the confidential informant, the informant's reliability, when the informant provided the information, or the informant's statements to the police.  In addition to the phone call, the sergeant sent Officer Longen a photograph of Mr. Hand, which Officer Longen understood the informant had provided to police. (*Id.* at 131.)

### A.       The Open Air Sniff

Officer Longen assembled a team of ten law enforcement officers to go to the bus terminal and investigate the informant's tip.  (*Id.* at 135, 137.)  The team included officers from the St. Paul Police Department, the Minneapolis-St. Paul Airport Police Department, and the Ramsey County Violent Crimes Enforcement Team.  (*Id.* at 50.)  Officer Longen informed the team that he had information on an individual transporting a firearm and drugs on a bus from St.

Paul to Chicago. (*Id.* at 53-54.) The team planned to confirm the information by having a canine conduct an open-air sniff of luggage and passengers present at the bus terminal platform. (*Id.* at 19.)

Officer Longen has been working with a narcotics detection canine named Archie ("Canine Archine") since February 2021. (*Id.* at 119-120.) Officer Longen and Canine Archie participate in the United States Police Canine Association ("USPCA") training program annually (*see Id.* at 122-23), and Canine Archie regularly performs training exercises with Officer Longen and trainers with the St. Paul Police canine unit (*Id.* at 124; Def. Ex. 5.) Though Canine Archie's training does not include double-blind training exercises (ECF No. 48 at 123-24), Canine Archie is certified with the USPA (*Id.* at 122-23). Officer Cook and Officer Longen both testified that Canine Archie has been a reliable canine for narcotics detection. (*Id.* at 80, 150.) Officer Longen used Canine Archie to conduct the open-air sniff at the bus terminal platform.

The operation began with a team of three officers including Detective Longen, who led with Canine Archie. (*Id.* at 136-37.) Sergeant Trevino was among the three officers who participated. He testified that when the police approached the platform, they identified Mr. Hand talking with an unidentified male. (*Id.* at 26, 28.) One or two other people were further down the platform, but no other passengers were nearby. (*Id.* at 26.)

As they approached, the police observed two benches with bags on them. (*Id.* at 27.) The first bench was next to where Mr. Hand and the unidentified male were talking, and the second bench was further down the platform. (*Id.* at 27.) Canine Archie sniffed the bags on both benches. He did not signal after sniffing the items on the first bench. (*Id.* at 27.) Mr. Hand's bags were located on and around the second bench.

While Canine Archie sniffed Mr. Hand's bags, Sergeant Trevino spoke to Mr. Hand and the unidentified male. He explained that they "were just checking for security stuff" and said the dog was sniffing all the luggage. (Gov. Ex. 2 at 1:10-1:17.) While Sergeant Trevino spoke, Mr. Hand smoked, talked, and moved freely around the platform. (Gov Ex 1 at 1:15.) Aside from Sergeant Trevino, no other officers approached Mr. Hand. (*Id.* at 1:15.)

Mr. Hand had four items on or near the second bench: (1) a red Nike shoebox located on the bench, (2) a gray bag located on top of the red Nike shoebox, (3) a white bag located on the ground, and (4) a black bag located on the ground. (ECF No. 48 at 29.) Canine Archie sniffed the gray bag, the red shoe box and the black roller bag without alerting. (Gov. Ex. 1 at 1:20-1:27.) When Canine Archie sniffed the white bag, he gave a full alert by sitting down. (ECF No. 48 at 29-30.) After Canine Archie sat down, Sergeant Trevino confirmed that Canine Archie had given a full alert by asking Detective Longen: "Are we good?" (*Id.* at 28, 30.)

### B.    Mr. Hand's Consent to Search

Once Sergeant Trevino received confirmation that Canine Archie had alerted, he "engaged Mr. Hand in conversation." (*Id.* at 28, 30.) Sergeant Trevino explained that the dog had alerted to Mr. Hand's bags and asked Mr. Hand a series of questions to eliminate the possibility that the bags belonged to someone other than Mr. Hand. (*Id.* at 30-31.) Sergeant Trevino explained to Mr. Hand that he was not in trouble and that, among other reasons, a canine can alert because of the presence of marijuana. (Gov. Ex. 2 at 1:37-48; ECF No. 48 at 64.) When Sergeant Trevino asked if he could search Mr. Hand's bags, Mr. Hand replied "go ahead." (Gov. Ex. 2 at 2:03.) Sergeant Trevino superficially patted down the area around Mr. Hand's waistline (Gov. Ex. 1 at 2:10-13), and then asked a second time if he had permission to search the bags. Mr. Hand replied, "Yeah. Ain't nothin' in there." (*Id.* at 2:26-27; Gov. Ex. 2 at 2:21-24.) During

this colloquy, the two other officers maintained their distance and Mr. Hand smoked and talked on his phone. (Gov Ex. 4 at 1:55-2:09.)

### C.   The Search of Mr. Hand's Bags

Sergeant Trevino then searched Mr. Hand's bags. Sergeant Trevino started with the items on the bench. (ECF No. 48 at 37.) He first searched the gray bag and did not find any contraband. (*Id.* at 38.) Next, he searched the red Nike shoe box and found a digital scale with white residue on it. (*Id.* at 38.) Sergeant Trevino testified that, based on his training, he believes white residue on digital scales is typically associated with fentanyl, cocaine, or heroin. (*Id.* at 38.) He further testified that these tools are typically used by drug traffickers or drug distributors. (*Id.* at 38.) While Sergeant Trevino was searching the red shoe box, Mr. Hand reiterated his consent to the search, stating, "Go ahead, check everything." (Gov. Ex. 1 at 3:14-17; Gov. Ex. 2 at 3:11-14.) Next, Sergeant Trevino searched the white bag and did not find anything of significance. (ECF No. 48 at 38.) Finally, he searched the black bag and found a firearm with a loaded magazine. (*Id.* at 38-39; Gov. Ex. 3.)

Once Sergeant Trevino began searching Mr. Hand's belongings, more officers approached and joined the three officers already on the scene. At least four officers encircled Mr. Hand, not including Sergeant Trevino, who was searching the bags. (Gov. Ex. 4 at 2:28.) Mr. Hand walked a short distance and talked on his phone. When he moved, the officers moved with him and began moving in closer to him. (Gov. Ex. 1 2:28 -3:40.) At one point, one of the officers asked Mr. Hand why he was moving around so much. (*Id.* at 3:10-3:12.) While Sergeant Trevino searched Mr. Hand's belongings, he asked him questions about where he was going and why he was traveling. (*Id.* at 2:42-3:19.) Upon discovering the gun, Sergeant Trevino asked Mr. Hand if he had a permit for it. (*Id.* at 5:35-5:52.) Mr. Hand said he bought it from a

store but stated that he did not have a permit.  (*Id.*)  On further questioning, Mr. Hand denied being a convicted felon or that he was prohibited from carrying a gun.  (Gov. Ex. 2 at 5:50-59.)

### D.    The Pat-Down Search

To ensure officer safety because a gun had been recovered, Officer Cook performed a second, more thorough pat-down search of Mr. Hand.  (ECF No. 48 at 84; *see also* Gov. Ex. 1 at 6:16-6:32, explaining the need for another pat-down for officer safety and to ensure Mr. Hand had no other weapons on him.)  Before starting the pat-down search, Officer Cook told Mr. Hand to place his hands behind his back but advised he was not under arrest.  (ECF No. 48 at 85; Gov. Ex. 4 at 6:27-6:33.)  Officer Cook testified that he did not try to intimidate or make any threats towards Mr. Hand and the video footage reflects no overt threats.  (ECF No. 48 at 85; Gov. Ex. 1 at 6:30-6:55.)

While performing the pat-down search, Officer Cook felt a baggie with a clay-like substance in Mr. Hand's pocket.  (ECF No. 48 at 87.)  Mr. Hand volunteered that the item was a charger piece, but Officer Cook told him it felt like a baggie.  (Gov. Ex. 4 6:45-6:52.)  Officer Cook testified that he immediately recognized the substance he felt in the baggie as cocaine based on his training and work experience.  (ECF No. 48 at 87.)  At that point, the police handcuffed Mr. Hand "for officer safety" and because Mr. Hand's movements led to a concern that he might flee.  (*Id.* at 88; Def. Ex. 4.)  One of the officers informed Mr. Hand that he was being detained.  (ECF No. 48 at 88, 112; Gov. Ex. 4 at 6:54-7:01.)  Officer Cook recovered from Mr. Hand's pocket "one baggie containing [the] clay-like substance, which was broken down into smaller baggies."  (ECF No. 48 at 88.)  After removing it Officer Cook commented, "That ain't weed.  It's exactly what I felt."  (Gov. Ex. 4 at 7:22-7:29.)  He also recovered "another baggie of smaller bindles … of a different substance and then a third baggie with a little bit of

marijuana." (ECF No. 48 at 88). In total, the police recovered 12.4 grams of cocaine and fentanyl and a small amount of marijuana. (*Id.* at 91.)

The police then escorted Mr. Hand to a bench and asked for his demographic information. (*Id.* at 92.) The officers ordered Mr. Hand to sit down on the bench, face a particular direction, cross his ankles, and stay that way. (*Id.* at 112.) The police did not provide Mr. Hand a *Miranda* warning until after he arrived at the law enforcement center. (*Id.* at 92-93.)

## DISCUSSION

### I.    Motion to Suppress Fruits of Unlawful Arrest and Seizure

The Fourth Amendment protects in relevant part the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). The seizure of a person "can take the form of physical force or a show of authority that in some way restrains the liberty of the person." *Torres v. Madrid*, 592 U.S. 306, 311 (2021) (quotations and citations omitted). The Fourth Amendment "does not forbid all searches and seizures but only such as are unreasonable." *Lawson v. United States*, 254 F.2d 706, 708 (8th Cir. 1958).

Moreover, "[i]t is well established that not all personal contacts between law enforcement officers and citizens constitute 'seizures' for Fourth Amendment purposes." *United States v. White*, 81 F.3d 775, 779 (8th Cir. 1996) (citing *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). The Supreme Court has established three categories of police-citizen encounters: a casual consensual encounter in a public place; a so-called *Terry* stop; and a full-scale arrest. *See Florida v. Royer*, 460 U.S. 491 (1983). *See also United States v. Hernandez*, 854 F.2d 295, 297 (8th Cir. 1988).

"The first, and least intrusive, police contact occurs when law enforcement officers merely approach an individual on the street and ask if he is willing to answer some questions." *United States v. Hernandez*, 854 F.2d 295, 297 (8th Cir. 1998). If the individual consensually answers questions and no detention occurs, there is "no seizure within the meaning of the Fourth Amendment." *Royer*, 460 U.S. at 498. Because no constitutional interest is implicated, the police do not need an objective justification to approach. *United States v. Mendenhall*, 446 U.S. 544, 554-55 (1980). Second, a so-called *Terry* stop allows police officers to "restrain an individual for a short period of time if they have an 'articulable suspicion' that the person has committed or is about to commit a crime." *Hernandez*, 854 F.2d at 297. A *Terry* stop results in a temporary seizure under the Fourth Amendment. *Royer*, 460 U.S. at 498. The last "category is a full-scale arrest, which must be based on probable cause." *Hernandez*, 854 F.2d at 297.

Mr. Hand argues the police violated his Fourth Amendment rights by: (1) conducting a *Terry* stop without reasonable, articulable suspicion; (2) exceeding the scope and intensity of a constitutionally permissible *Terry* stop by searching his belongings without voluntary consent; and (3) exceeding the scope and intensity of a constitutionally permissible *Terry* stop when the officers patted him down. (ECF No. 38.)

### A.    Reasonable Suspicion

Mr. Hand's contention that the police conducted a *Terry* stop without reasonable suspicion fails because no seizure occurred until after he consented to the search. It is well-settled that when police use a trained canine to briefly sniff luggage at an airport or other public place and do not move or detain the luggage for any significant length of time, the sniff does not alone constitute a "search" within the meaning of the Fourth Amendment. *See United States v. Place*, 462 U.S. 696, 707 (1983). Here, the police did not touch Mr. Hand's luggage until after

he consented to the search, and Canine Archie's non-invasive sniff took no more than 15 seconds.  (Gov. Ex. 1 at 1:20-1:35.)

Moreover, the initial interaction between the police and Mr. Hand amounts to nothing more than a consensual encounter.  "Whether an encounter is consensual depends on the facts of the case."  *United States v. Munoz*, 590 F.3d 916, 921 (8th Cir. 2010).  Although there is "no bright line between a consensual encounter and a *Terry* stop," the determination is based on the unique facts of each case.  *United States v. Beck*, 140 F.3d 1129, 1135 (8th Cir. 1998) (citations omitted).  "A seizure does not occur simply because a law enforcement officer approaches an individual and asks a few questions or requests permission to search an area … provided the officer does not indicate that compliance with his request is required."  *White*, 81 F.3d at 779 (citing *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991).)  "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."  *Bostick*, 501 U.S. at 434 (citations omitted).  Circumstances indicative of a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Beck*, 140 F.3d at 1135 (quotations and citations omitted).

Mr. Hand contends he was immediately and impermissibly seized when the officers surrounded him and searched his belongings.  (ECF No. 51 at 10-12.)  The Court disagrees with Mr. Hand's characterization of events.  Although three officers and a narcotics-detection canine were present initially, only Sergeant Trevino approached Mr. Hand, and he did so only after Canine Archie alerted to one of Mr. Hand's bags.  When Sergeant Trevino approached Mr. Hand, he was in plain clothes, did not display a weapon, maintained his distance, and used

informal, non-threatening language to explain that the dog had alerted to Mr. Hand's bags. *See United States v. Flores-Sandoval*, 474 F.3d 1142, 1145-46 (8th Cir. 2007) (finding officer contact was consensual when the officer did not use "language or a tone" demanding compliance, wore plain clothes, and did not display a weapon). None of the officers used physical force or displayed authority when Mr. Hand was first approached. The events prior to Mr. Hand consenting to the search of his bags did not constitute a *Terry* stop, let alone an arrest, and no seizure occurred at that time.[1]

## B. Voluntary Consent

Because the initial encounter between Sergeant Trevino and Mr. Hand was consensual and did not invoke the Fourth Amendment, the "fruits of the search" of Mr. Hand's bag need not be suppressed unless his unequivocal consent to the search during that initial encounter was involuntary. *White*, 81 F.3d at 780. "Under the fourth and fourteenth amendments searches conducted without a warrant issued upon probable cause are presumptively unreasonable, subject to a few specifically established exceptions." *United States v. Cedano-Medina*, 366 F.3d 682, 684 (8th Cir. 2004) (citing *Katz v. United States*, 389 U.S. 347, 356-357 (1967)). One such exception is if the search is "conducted pursuant to the knowing and voluntary consent of the person subject to the search." *United States v. Escobar*, 389 F.3d 781, 784 (8th Cir. 2004) (quotations and citation omitted). Consequently, if Mr. Hand voluntarily consented to having

---

[1] The government additionally contends that police had reasonable suspicion to conduct a *Terry* stop, to the extent required, based on the informant's tip. (ECF No. 54 at 11.) But a wholly uncorroborated tip from an anonymous source such as the one at issue here lacks sufficient indicia of reliability to establish reasonable suspicion for an investigatory stop. *See Florida v. J. L.*, 529 U.S. 266 (2000) (anonymous tip that young black male standing at particular bus stop and wearing plaid shirt was carrying gun lacked sufficient indicia of reliability to establish reasonable suspicion to make *Terry* investigatory stop of suspect matching description). The Court thus concludes the initial encounter with Mr. Hand was permissible solely because no seizure occurred, and not because the officers had reasonable suspicion to stop and detain him.

his bags searched, the question of whether the police had probable cause to search his bags based on the informant's tip or Canine Archie's positive alert is irrelevant.[2]

"An individual may validly consent to an otherwise impermissible search if, in the totality of the circumstances, consent is freely and voluntarily given, and not the product of implicit or explicit coercion." *United States v. Rambo,* 789 F.2d 1289, 1296 (8th Cir.1986) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 226–27 (1973)). "The mere fact that one has taken drugs, or is intoxicated, or mentally agitated, does not render consent involuntary." *Rambo*, 789 F.2d at 1297. Rather, "the question is one of mental awareness so that the act of consent was the consensual act of one who knew what he was doing and had a reasonable appreciation of the nature and significance of his actions." *Id.* (quotations and citations omitted).

For the reasons previously stated, the Court finds no basis in record to conclude Mr. Hand's consent was the product of intimidation or coercion. And while there is evidence that Mr. Hand may have been smoking marijuana when he consented to searching his bags (ECF No. 48 at 60-61, 108, 138), Mr. Hand did not appear to be impaired in any way (*see* Gov. Ex. 1 at 1:05-2:27). Because Mr. Hand was in control of his faculties, his consent was voluntary. *United States v. Contreras*, 372 F.3d 974, 977–78 (8th Cir. 2004) (finding voluntarily consent despite defendant's use of methamphetamine the previous evening and marijuana on the day of consent based on agent's testimony that he appeared "sober and in control of his faculties"); *see also*

---

[2] Mr. Hand appears to suggest the search was improper because Canine Archie was unreliable. (ECF No. 57 at 2-3, noting that Canine Archie had no double-blind training and no recent blind training exercises, and that his training logs failed to identify false positives.) The Court finds that as a certified canine with USPCA, Canine Archie was sufficiently reliable to conduct the search. *United States v. Collier*, 116 F.4th 756, 761 (8th Cir. 2024) ("A dog is presumptively reliable at detecting illicit drugs—and its alert establishes probable cause for a search—if the dog has satisfactorily completed a bona fide certification or training program.") (citing *Florida v. Harris*, 568 U.S. 237, 246–47 (2013)). And regardless of whether Canine Archie was reliable or not, the bag search was justified by Mr. Hand's voluntary consent.

*United States v. Gottsch*, No. 8:05CR253, 2005 WL 3087867, at *5 (D. Neb. Nov. 17, 2005), *report and recommendation adopted sub nom. United States v. Dunbar*, No. 8:05CR253, 2005 WL 3348859 (D. Neb. Dec. 8, 2005) (collecting Eighth Circuit decisions finding voluntary consent despite intoxication).   Three police officers present during the search testified that they had no concern that Mr. Hand was intoxicated.   (ECF No. 48 at 32 (Sergeant Trevino), 83 (Officer Cook) and 152 (Officer Longen)).   Sergeant Trevino specifically testified that he observed no indicia of intoxication: Mr. Hand did not slur his speech or exhibit any confusion about the questions asked of him; he was quick to converse; and his answers "made sense." (*Id.* at 32.) This testimony is consistent with the Court's observations based on the video evidence submitted.   (*See generally* Gov. Ex. 1; Gov. Ex. 2.)   The Court thus concludes that Mr. Hand voluntarily consented to the search of his bags.

### C.       The Pat-Down Search

The officers conducted a *Terry* pat-down search after they found the gun in Mr. Hand's luggage.   "Under *Terry*, a law enforcement officer may conduct a warrantless pat-down search for the protection of himself or others nearby in order to discover weapons if he has a reasonable, articulable suspicion that the person may be armed and presently dangerous."   *United States v. Muhammad*, 604 F.3d 1022, 1026 (8th Cir. 2010) (quotations and citations omitted).   "When an officer discovers contraband during the course of a legitimate *Terry* search, 'the Fourth amendment does not require its suppression.'"   *United States v. Williams*, 139 F.3d 628, 630 (8th Cir. 1998) (quoting *Michigan v. Long*, 463 U.S. 1032, 1050 (1983)).   "If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons." *Williams*, 139 F.3d at 630 (quoting *Minnesota v.*

*Dickerson,* 508 U.S. 366, 375–77, (1993); citing *United States v. Craft,* 30 F.3d 1044 (8th Cir.1994) and *United States v. Hughes,* 15 F.3d 798, 802 (8th Cir.1994)).  The government has the burden of proof to justify a warrantless search.  *Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984).

Here, there is no dispute that the officers conducted the pat-down search upon finding a weapon in Mr. Hand's bag and stating that they needed to confirm he was not carrying any other weapons.  (Gov. Ex. 1 at 6:16-6:32.)  Moreover, Officer Cook testified that on patting down Mr. Hand's outer clothing to check for weapons he immediately recognized the baggie with a clay-like substance in Mr. Hand's pocket as containing narcotics, specifically cocaine.  (ECF No. 48 at 87.)  Officer Cook stated that he recognized the substance based on his previous training and experience with identifying narcotics based on feel.  (*Id.*)

Mr. Hand does not challenge the well-established principle that a *Terry* pat-down search is justified when police believe a suspect may be carrying a weapon, but argues that Officer Cook exceeded the permissible scope of a *Terry* search by looking for suspected narcotics during the pat-down.  (ECF No. 51 at 14.)  Mr. Hand contends that by stating, "That ain't weed.  It's exactly what I felt.", Officer Cook demonstrated he was searching for narcotics.  (*Id.* at 15.)  He cites *Sibron v. New York*, 392 U.S. 40, 64 (1968), in which the Supreme Court found a pat-down impermissible because the officer demonstrated he was searching for drugs by stating "you know what I am after."  (ECF No. 51 at 15).  But *Sibron* is materially distinguishable.  There, the police had no specific, articulable facts suggesting the suspect might be armed.  *See id.*  The officer in *Sibron opened* his exchange with the suspect by stating, "you know what I am after."  *Id.*  Here, Officer Cook's statement came *after* the discovery, and merely described what he had already found.  And the officer in *Sibron* did not begin by patting down the suspect's outer clothing as

Officer Cook did, but instead immediately thrust his hands into the suspect's pocket to recover the drugs. *Id.* at 65. *Sibron* does not support Mr. Hand's position, and the Court cannot conclude from Officer Cook's statement that the pat-down search was an unjustified search for narcotics.

Under *Williams*, Officer Cook's identification of narcotics based on the pat-down search of Mr. Hand's outer clothing was permissible, and that information established probable cause to search Mr. Hand's pockets and retrieve the drugs. 139 F.3d at 630. The Court finds that the police lawfully removed the baggie containing drugs from Mr. Hand's pocket during the *Terry* search. Mr. Hand's Motion to Suppress Fruits of Unlawful Arrest and Seizure should be denied on these grounds.

## II.    Motion to Suppress Statements

The Fifth Amendment requires law enforcement officers to inform a person of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), before beginning a custodial interrogation. *United States v. New*, 491 F.3d 369, 373 (8th Cir. 2007); *see also United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990) ("The basic rule of *Miranda* is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning.") *Miranda* warnings must be given whenever a suspect is interrogated while in custody. *Griffin*, 922 F.2d at 1347.

Mr. Hand argues that the Court should suppress any statement he made after 11:34 a.m. on the date of his arrest prior to the reading of his *Miranda* warning at the law enforcement center. (ECF No. 37 at 2.) He asserts that he was seized and placed under a *"de facto"* arrest when the officers and Canine Archie approached him on the platform. (ECF Nos. 37, 51 at 15-18.) The government opposes Mr. Hand's motion on the grounds that he was never "in custody" prior to or during any questioning and that all his statements were voluntary. (ECF No. 54 at 17-

22.)   Both parties have failed to articulate reasonably nuanced positions; instead offering extremes:  Either Mr. Hand was in custody the entire time, or he was never in custody; either none of Mr. Hand's statements were voluntary, or they all were.  The Court concludes that both parties are wrong.

### A.  Custodial Status

To determine whether a person is in police custody, "the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  *New York v. Quarles*, 467 U.S. 649, 655 (1984) (quotations and citations omitted).   To answer this question, courts consider "the totality of the circumstances that confronted the defendant at the time of questions, and … whether a reasonable person would have felt that he or she was free to terminate the interview and leave."  *United States v. Williams¸* 760 F.3d 811, 814 (8th Cir. 2014).  The Eighth Circuit has identified six non-exclusive factors it considers to determine whether a person is in custody:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; [and], (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Laurita*, 821 F.3d 1020, 1024 (8th Cir. 2016) (citing *Griffin,* 922 F.2d at 1349. The first three factors "may be fairly characterized as mitigating factors and the last three may be characterized as coercive factors."  *Laurita*, 821 F.3d at 1024) (quotations and citation omitted).

Having applied the *Griffin* factors and considered the totality of the circumstances, the Court rejects Mr. Hand's argument that the police placed him in custody when they first

approached him.  Upon approaching Mr. Hand, the Sergeant Trevino informed him that he had not done anything wrong and that the dog could have alerted for many different reasons.  (ECF No. 48 at 64, Gov. Ex. 2 at 1:37-1:44.)  This suggested that Mr. Hand was free to leave, and the officers did nothing to prevent him from doing so.  And indeed, Mr. Hand showed unrestrained freedom of movement when the police first approached him:  He made a phone call, smoked, and walked around the platform.  (Gov. Ex. 4 at 1:55-2:09.)  Next, as discussed above, Mr. Hand voluntarily answered Sergeant Trevino's questions and repeatedly gave permission for the police to search his bags.  (Gov. Ex. 2 at 2:03; Gov. Ex. 1 at 2:26-27.)  Although three officers were present, only one officer approached Mr. Hand, and the environment was not police-dominated when Mr. Hand consented to the search.  Finally, Mr. Hand was not placed under arrest after Sergeant Trevino's initial questioning.

Although Mr. Hand was not initially detained, the police plainly detained him and he was "in custody" at some point before he arrived at the law enforcement center and received his *Miranda* warning.  The Court finds that the police placed Mr. Hand in custody for purposes of *Miranda* when they handcuffed him during the second *Terry* pat-down search.  (*See* Gov. Ex. 4 at 6:55-59.)  Upon handcuffing Mr. Hand one of the officers told him, "For your safety and ours, *you're getting detained right now*."  (*Id.*, emphasis added.)  Mr. Hand appears to have understood that he was under arrest, as demonstrated by his response: "What? What'd I do?".  (*Id.* at 6:59-7:01.)  An officer told him, "You've got a gun on you, you smell like weed, and you're moving all over the place."  (*Id.* at 7:01-7:05.)  Though the officers did not state that Mr. Hand was under arrest, they plainly sought to restrict his movements, and the atmosphere had become police-dominated.  At that point at least eight officers surrounded Mr. Hand, the police had taken away Mr. Hand's cigarette and cell phone, and he was unable to physically move.  One

of the officers directed Mr. Hand to sit on a bench on the platform, told him which direction to face, ordered him to cross his ankles, and stood guard next to him to prevent him from moving. (*Id*. at 7:59-8:10.)  The officer then brought out a notebook and started questioning Mr. Hand. (*Id*. at 9:09.)  Following the questioning, the officers walked Mr. Hand towards a squad car, patted him down a third time, placed him in the car, and took him to the law enforcement center for booking.  (*See id*. at 14:20-15:23; Gov. Exs. 6, 7.)

The United States Supreme Court has found that when a person is surrounded by at least four police officers and handcuffed while questioning is taking place, the person is under arrest because the officers are no longer concerned for their personal safety.  *Quarles*, 467 U.S. at 655. That Mr. Hand was not yet under formal arrest when the officers placed the handcuffs on him is not dispositive.  *See United States v. Martinez*, 462 F.3d 903, 908-910 (8th Cir. 2006) (finding district court erred in failing to suppress statements made by suspect who was questioned after being handcuffed during *Terry* stop).  While most *Terry* stops do not trigger *Miranda* rights, a *Miranda* warning is required before questioning an individual who is "subjected to restraint associated with formal arrest" and "interrogated during that custody."  *Id*. at 909-910 (citing *Berkemer v. McCarty*, 468 U.S. 420 (1984)); *see also United States v. Childers*, No. 20-211 (PAM/ECW), 2021 WL 5890662, at *7-8, 12-13 (D. Minn. Sept. 27, 2021) (rejecting argument that length of detention, presence of a dozen officers, and their use weapons and handcuffs converted *Terry* stop into a *de facto* arrest, but finding defendant was in custody for purposes of *Miranda*); *United States v. May*, 440 F. Supp. 2d 1016, 1029 (D. Minn. 2006) (finding that police placed defendant in custody for *Miranda* purposes when they handcuffed him and restrained his physical movement); *cf. United States v. Oakes*, No. 07-315 (MJD/SRN), 2007 WL 4179400, at *3 (D. Minn. Nov. 20, 2007) (defendant was not in custody because officer did

not draw his weapon, formally arrest him, instruct him not to leave, handcuff him, place him in a squad car or remove him to a confined location for questioning during *Terry* stop); *United States v. Rekonen*, No. 07-123 (JNE/RLE), 2007 WL 2973840, at *17 (D. Minn. Oct. 9, 2007) (defendant was not in custody during *Terry* stop because he was not handcuffed or forced to remain in any particular spot until he was formally arrested). Based on the foregoing, the Court concludes that the officers placed Mr. Hand in custody for purposes of *Miranda* when they handcuffed him and told him he was being detained. Because the Court finds Mr. Hand was not in custody before he was handcuffed, however, the Court denies his Motion to Suppress Statements with prejudice with respect to that period.

### B. Other Grounds for Admissibility

The Court's finding that Mr. Hand was in custody after he was handcuffed and before he received a *Miranda* warning does not end the inquiry. The Court must also consider whether the statements he made during that period were spontaneous, voluntary utterances, and whether the questions were routine requests for basic identification information to which *Miranda* does not apply. *See United States v. Ochoa-Gonzalez*, 598 F.3d 1033, 1038-39 (8th Cir. 2010); *United States v. Kelly*, No. 08-390 (ADM/SRN), 2009 WL 1047612, at *7-8 (D. Minn. April 20, 2009).

Here, the parties' failure to adopt more nuanced positions and address the statements at issue in detail significantly impedes the Court's analysis. The government argues Mr. Hand's statements were "voluntary" but does not address any given statement with specificity. (*See* ECF No. 54 at 20-22.) The government further appears to misapprehend the scope of Mr. Hand's motion as seeking only to suppress his statements to Sergeant Trevino. (*Id.* at 21, arguing that "Hand's interaction with Sgt. Trevino was brief.") This is problematic, since Mr. Hand requests suppression of *any* statements after 11:34 a.m. on August 4, 2023. (ECF No. 37 at

18

2.)  But the Court does not have a record of every statement Mr. Hand may have made before he received a *Miranda* warning or precisely when that warning was given.  Nor does the Court have any indication as to which of his statements during the period in question, if any, the government might seek to offer into evidence.  It is apparent that many of Mr. Hand's statements were spontaneous utterances and some of the officers' questions solicited mere background information regarding Mr. Hand's contact information and identity.  (*See* Gov. Ex. 4 at 6:59-15:23; Gov. Exs. 6, 7.)

Rather than attempting to guess at the parties' unstated positions, the Court recommends that Mr. Hand's motion to suppress any statements he may have made during this period be denied without prejudice.  The Court further directs the parties to meet and confer and discuss, with specificity, whether the suppression of any of Mr. Hand's statements after he was handcuffed and before he received a *Miranda* warning is contested.  If so, Mr. Hand may file a motion to reconsider this Report and Recommendation.  Any such motion must identify with precision which statements are at issue.  The motion must also be accompanied by a proposed briefing schedule, a motion to continue the deadline to file pretrial motions, and a commensurate motion to exclude time from the Speedy Trial Act.

### III.    Motion to Disclose and Make Informant Available for Interview

Mr. Hand seeks an order compelling the government to disclose the identity of any informants used in the government's investigation and to make them available for interview. (ECF No. 26 at 1.)  "The Government has a general, although not absolute, 'privilege to withhold the disclosure of the identity of a confidential informant.'" *United States v. Washington*, No. 21-cr-126 (ADM/ECW), 2022 WL 538878, at *16 (D. Minn. Feb. 23, 2022) (quoting *Carpenter v. Lock*, 257 F.3d 775, 779 (8th Cir. 2001)), *report and recommendation adopted*, 2022 WL

1658175 (D. Minn. May 25, 2022). Thus, in a motion to compel disclosure of a confidential

informant, "the defendant bears the burden of demonstrating the need for the disclosure, and the

court must weigh the defendant's right to information against the government's privilege to

withhold the identity of its confidential informants." *United States v. Harrington*, 951 F.2d 876,

877 (8th Cir. 1991) (citing *United States v. Johnson*, 886 F.2d 1120, 1120 (9th Cir. 1989);

*Roviaro v. United States*, 353 U.S. 53, 59 (1957)). There is no litmus test to determine whether

disclosure is justified; instead, courts must consider "the particular circumstances of each case,

taking into consideration the crime charged, the possible defenses, the possible significance of

the informer's testimony, and other relevant factors." *Rovario*, 353 U.S. 53, 62 (1957). "[O]ne

of the most relevant factors to be weighed by the court in determining whether to order

disclosure is whether or not the evidence is *material* to the accused's defense or a fair

determination of the cause." *Harrington*, 951 F.2d at 877 (brackets omitted) (emphasis in

original) (quoting *United States v. Barnes*, 486 F.2d 776, 778 (8th Cir. 1973)). The defendant's

showing of materiality must be more than "mere speculation." *Harrington*, 951 F.2d at 877

(citation omitted). "[E]vidence is material only if there is a reasonable probability that, had the

evidence been disclosed to the defense, the result of the proceeding would have been different."

*Id.* at 878 (quoting *United States v. Parker*, 836 F.2d 1080, 1083 (8th Cir. 1987), *cert denied*,

486 U.S. 1025 (1988)).

Generally speaking, when the informant "is an active participant or witness to the

offense charged, disclosure will almost always be material," such that disclosure is required.

*Devose v. Norris*, 53 F.3d 201, 206 (8th Cir. 1995). In contrast, in "cases involving 'tipsters' who

merely convey information to the government but neither witness nor participate in the offense,

disclosure is generally not material to the outcome of the case and is therefore not required."

*Harrington*, 951 F.2d at 878; *see also United States v. Moore,* 129 F.3d 989, 992 (8th Cir.1997) (citing *United States v. Sykes,* 977 F.2d 1242, 1245–46 (8th Cir.1992); *Harrington,* 951 F.2d at 878).

Mr. Hand argues the Government must disclose the identity of any informants who provided information to the police because they played a critical role in the case investigation and establishing probable cause for the investigatory stop.  (ECF No. 51 at 6-9.)  The Court finds Mr. Hand's argument does meet his burden.  Although the informant's tip prompted the police investigation, as previously discussed, the police did not need probable cause or consent to conduct an open-air sniff at the bus terminal.  *See United States v. Harvey*, 961 F.2d 1361 (8th Cir. 1992) (finding a canine open-air sniff does not constitute a search under the Fourth Amendment); *see also United States v. Tuton*, 893 F.3d 562, 566 n.2 (8th Cir. 2018) (stating that the police "need not obtain consent to conduct a dog sniff during an otherwise lawful encounter") (quoting *United States v. Grant*, 696 F.3d 780, 784 (8th Cir. 2012), *cert. denied*, 571 U.S. 832 (2013)).  And once Canine Archie alerted to Mr. Hand's bags, the police had sufficient probable cause to conduct a *Terry* stop.  *United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010) (citations omitted) (stating "an alert or indication by a properly trained and reliable drug dog provides probable cause for the arrest and search of a person or for the search of a vehicle").  Consequently, once Canine Archie alerted to Mr. Hands bags, and Mr. Hand consented to the search of his bags, the information provided by the informant had no bearing on the chain of events that transpired.

Furthermore, even if the informant's tip had been necessary to establish probable cause for the search, it would not have been sufficiently material to warrant disclosure.  *See United States v. Cole*, 23-cr-175 (DWF/DJF), 2023 WL 9547891, at *6-7 (D.  Minn. Oct. 25, 2023)

(finding probable cause based in part on information from two informants, including a tip and a controlled buy); 2023 WL 4760585, at *2-3 (July 26, 2023) (denying motion to disclose informants' identities); 2024 WL 620218, at *1-3 (Feb. 14, 2024) (same). There is nothing in the record suggesting the informant whose tip prompted the open-air sniff was a witness or participant in the offenses charged against Mr. Hand or that the government intends to call the informant to testify at Mr. Hand's trial. *See Harrington*, 951 F.2d at 878. Mr. Hand's contention that the identity of the informant might be material to the outcome of his case amounts to mere speculation. The Court therefore denies his motion for disclosure of the informant's identity.

### IV.    Motion for Hearing Pursuant to *Franks v. Delaware*

Under *Franks v. Delaware*, 438 U.S. 154 (1978), a defendant "may request a hearing to challenge a search warrant on the ground that the supporting affidavit contains factual misrepresentations or omissions" relevant to the signing judge's determination of probable cause for the warrant. *United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013). A defendant is entitled to a *Franks* hearing only if: (1) he makes "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless regard for the truth, was included by the affiant in the supporting affidavit"; and (2) "the allegedly false statement is necessary to the finding of probable cause." *United States v. Patterson*, 68 F.4th 402, 414 (8th Cir. 2023) (quoting *Franks*, 438 U.S. at 155- 56) (internal quotation marks omitted).

When a defendant seeks a *Franks* hearing based on omissions from a warrant affidavit, the "defendant must make a substantial preliminary showing that there was an intentional or reckless omission from [the] affidavit that was necessary to the finding of probable cause." *United States v. Hansen*, 27 F.4th 634, 636-37 (8th Cir. 2022) (quotations and citations omitted). "To prevail, a defendant must show more than negligence or an innocent mistake." *United States*

*v. Finley*, 612 F.3d 998, 1002 (8th Cir. 2010).  But "[r]ecklessness … may be inferred from the fact of omission of information from an affidavit … when the material omitted would have been clearly critical to the finding of probable cause."  *United States v. Mashek*, 606 F.3d 922, 928 (8th Cir. 2010) (quotations and citation omitted).  "Reckless disregard for the truth" may also exist when "the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported."  *Finley*, 612 F.3d at 1002; *see also United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993) (an officer acts recklessly by withholding information when any "reasonable person would have known that this was the kind of thing the judge would wish to know").

The requirement of a substantial preliminary showing "is not lightly met".  *United States v. Mathison*, 157 F.3d 541, 548 (8th Cir. 1998) (quotations and citation omitted).  It requires more than mere allegations:  A defendant satisfies this standard only by making an offer of proof, through affidavits or other similarly reliable evidence.  *Franks*, 438 U.S. at 171.

If a defendant does satisfy the substantial preliminary showing that a hearing is warranted, he may be entitled to relief if he establishes by a preponderance of the evidence that his allegation of perjury or reckless regard for the truth is supported and that "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause."  *Franks*, 438 U.S. at 156).  In the case of an omission, suppression is appropriate "*only* if the affidavit as supplemented by the omitted material *could not* have supported the existence of probable cause."  *United States v. Lueth*, 807 F.2d 719, 726 (8th Cir. 1986) (emphasis in original).  In either case, the Court must void the search warrant and exclude the fruits of the search "to the same extent as if probable cause was lacking on the face of the affidavit."  *Franks*, 438 U.S. at 156.

Mr. Hand's Motion for a *Franks* hearing challenges two search warrant affidavits from Officer Longen: (1) an affidavit for a warrant to search his cell phone (ECF No. 41 at 1-6); and (2) an affidavit for a warrant to obtain a DNA buccal swab (*Id.* at 7-10). (*See* ECF No. 39.) He argues the search warrant affidavits omit the fact that an informant was the "genesis" of the investigation, and instead give the impression that the interdiction was "a more organic and by-chance occurrence" (ECF No. 40 at 5). He also contends the affidavits misstate that the *Terry* search occurred "[u]pon the location of a stolen firearm," when in fact the officers did not know the firearm was stolen at the time (*Id.*). Neither argument is persuasive.

First, Mr. Hand claims that if Officer Longen had included information regarding the informant's tip in the affidavits, the police would not have established probable cause for the warrant. This argument is illogical. If anything, the inclusion of additional information regarding the tip would have bolstered probable cause. And as previously discussed, although the information received from the informant "tipped off" the investigators to Mr. Hand's illegal activity, the police did not use this information to establish probable cause to search Mr. Hand's belongings or person. Moreover, probable cause for the subsequent search warrants was based on the evidence found during the search of Mr. Hand's bags and person along with background checks on Mr. Hand. Mr. Hand proffers no evidence, in the form of affidavits or otherwise, on which the Court might find that omission of the informant's tip was "clearly critical to finding probable cause." *See United States v. Williams*, 477 F.3d 554, 559 (8th Cir. 2007) (quotations and citations omitted). Because the informant's role was not critical to a finding of probable cause, there is no colorable basis to infer that Officer Longen's omission of information regarding the informant was reckless.

Second, Mr. Hand argues that the affidavits are affirmatively misleading in that they misstate when police knew that the firearm found in Mr. Hand's luggage was stolen. The affidavits state that "[u]pon the location of a stolen firearm, Officer D. Cook… conducted a Terry Frisk of Hand for our safety," instead of explaining that the firearm was identified as stolen after the *Terry* frisk. (ECF No. 41 at 3.) Mr. Hand contends that the alleged misstatement of when the police became knowledgeable that the firearm was stolen would undermine the judiciary's finding of probable cause. (ECF No. 40 at 5-6.)

Although the cited portions of the affidavits include no clear misstatements of fact, the Court agrees that they are potentially misleading in that they imply the officers knew the firearm was stolen when they frisked Mr. Hand. But whether misleading or not, precisely when the officers determined the gun was stolen appears to have had no bearing on probable cause to conduct the searches authorized by the warrants. Regardless of the timing, the fact remains that Mr. Hand illegally possessed a stolen firearm, and thus the statements at issue were not critical to the signing judge's finding of probable cause. Nor are the statements determinative of whether the officers had sufficient justification to conduct the pat-down that followed discovery of the gun. As previously discussed, the fact that Mr. Hand had a gun in his suitcase established reasonable suspicion that he might have another weapon on his person, such that a pat-down was necessary to ensure the officers' safety. The Court therefore finds that the statements at issue were not critical to a finding of probable cause, and consequently, they were not reckless.

For the foregoing reasons, the Court concludes that Mr. Hand has not made a preliminary showing that the warrant affidavits contained intentional or reckless false statements necessary to the judge's finding of probable cause. His motion for a *Franks* hearing is denied accordingly.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1. Defendant Jeremiah Thelmon-Isaiah Hand's Pretrial Motion to Disclose and Make Informant Available for Interview (ECF No. 26) is **DENIED**; and

2. Defendant Jeremiah Thelmon-Isaiah Hand's Motion for a Hearing Pursuant to *Franks v. Delaware* (ECF No. 39) is **DENIED**.

3. Consistent with this Order and Report and Recommendation, counsel for the parties are directed to conduct a meet and confer by **February 10, 2025** and discuss, with specificity, whether the suppression of any of Mr. Hand's statements after he was handcuffed and before he received a *Miranda* warning is contested. If so, Mr. Hand may file a motion to reconsider the Court's recommendation that his motion to suppress statements be denied with respect to that period, which shall be due by **February 17, 2025**.  Any such motion must identify with precision which statements are at issue.  The motion must also be accompanied by a proposed briefing schedule, a motion to continue the deadline to file pretrial motions, and a commensurate motion to exclude time from the Speedy Trial Act.

## RECOMMENDATION

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

1. Defendant Jeremiah Thelmon-Isaiah Hand's Pretrial Motion to Suppress Fruits of Unlawful Arrest and Search and Seizure (ECF No. 38) be **DENIED**; and

2.  Defendant Jeremiah Thelmon-Isaiah Hand's Pretrial Motion to Suppress Statements (ECF No. 37) be:

    a.  **DENIED WITH PREJUDICE** as to the period of time before he was handcuffed; and

    b.  **DENIED WITHOUT PREJUDICE** as to the period of time after he was handcuffed.

Dated: February 3, 2025          *s/ Dulce J. Foster*_____
                                    DULCE J. FOSTER
                                    United States Magistrate Judge

## <u>NOTICE</u>

**Report and Recommendation**

Filing Objections:  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).

**Order**

Filing Objections: This Order is not appealable to the Eighth Circuit Court of Appeals until the conclusion of this matter.

Under Local Rule 72.2(b)(1), "a party may file and serve written objections to order within 14 days after being served a copy" of the order.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).